**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MEDINA VASILY (INDEPENDENT TRUSTEE OF THE LAMBROS E. SIDERIDES INSURANCE TRUST INDENTURE); ELLIOT J. SIDERIDES AND ELIZABETH SIDERIDES THEOFANIDES (CO-EXECUTORS OF THE ESTATE OF LAMBROS SIDERIDES); and CLEO SIDERIDES, | ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | 3:11-CV-530 (GWC) |
| MONY LIFE INSURANCE COMPANY OF AMERICA, | ) ) ) | |
| Defendant. | ) | |

**OPINION AND ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**(Doc. 42)**

Plaintiffs Medina Vasily, independent trustee of the Lambros E. Siderides Insurance Trust Indenture; Elliot J. Siderides and Elizabeth Siderides Theofanides, co-executors of the estate of Lambros Siderides; and Cleo Siderides, widow of the late Lambros Siderides (collectively "plaintiffs") bring this action against defendant MONY Life Insurance Company of America ("MONY") seeking payment of death proceeds on two insurance policies issued on the life of Lambros Siderides. Plaintiffs assert four claims against MONY: breach of contract; equitable estoppel; "disproportionate forfeiture/unfair penalty"; and breach of the duty of good faith and fair dealing. (Doc. 1.) MONY has moved for summary judgment on all claims, contending there was no breach of any duty to its insured. For the reasons stated below, the court GRANTS IN PART and DENIES IN PART MONY's motion.

### I.    Undisputed Facts

In May of 2001, Dr. Lambros Siderides obtained three life insurance policies from MONY. A policy with a face amount of $600,000 was made payable to the Lambros E.

Siderides Trust Indenture ("Trust Policy"); a policy with a face amount of $200,000 was made payable to Cleo Siderides ("Spouse Policy"); and a policy with a face amount of $400,000 (later reduced to $200,000) was made payable to the Siderides Estate ("Estate Policy"). (Docs. 43 at 3; 47 at 2.)

Dr. Siderides died on June 7, 2010 due to complications from idiopathic pulmonary fibrosis, which affects the lungs. (Doc. 47-4.) The beneficiaries to the three policies made claims for the death proceeds. MONY paid the proceeds on the Estate Policy, but it denied the claims for death proceeds on the Spouse and Trust Policies "on the ground that the Policies had lapsed and that the Insured was not living when payment [of the latest premiums] was received on June 14, 2010." (Doc. 44 at 7.)

The relevant provisions of the three policies are identical. (*See* Docs. 43 at 3-4; 44-1; 44-2; 47-4 at 20-69.) The policies required that premiums be paid on a quarterly basis. (Doc. 44-1 at 4.) Payments were due on the second day of the months of February, May, August, and November. (Doc. 44 at 3.) The contracts provide:

> If the Insured dies while this policy is in force and while premiums are being paid, we will pay the Death Proceeds of this Policy to the Beneficiary. Payment will be made subject to all the provisions of this Policy . . . .
>
> The Death Proceeds payable to the Beneficiary will be the sum of:
>
> —the amount of insurance then in force . . . ;
> —any portion of premium paid that applies to a period beyond the policy month in which the Insured dies . . . ;
>
> LESS:
>
> —an amount equal to one month's premium if the Insured dies during the grace period of an unpaid premium.

(*Id.* at 7.) Under the "Premiums and Policy Exchange" provision, each policy provides: "No premium due is payable on or after the date of the Insured's death." (*Id.* at 8.)

Each policy contains a "Grace Period" provision to supply an additional period after the premium due dates to "allow [the insured] to pay any amount needed to keep this Policy in force." (*Id.* at 9.) The grace period "runs for 31 days from the premium due date." (*Id.*)

"[D]uring the grace period this Policy will continue in force.  If any premium is not paid by the end of the grace period, the Policy will end at once.  The policy will have no further value."  (*Id.*)

Each policy also contains a "Reinstatement" provision:

If any premium is not paid by the end of the grace period you may reinstate the policy within 5 years of the due date of the first premium in default.

*What does the Company require for reinstatement of my policy?*

We will need:

    (a)  evidence satisfactory to us of the Insured's insurability; plus
    (b)  payment of all overdue premiums plus compound interest at 8% a year.

(*Id.* at 11.)  The requisite evidence of insurability is not defined or expanded upon in the policies.

In November 2001, Dr. Siderides failed to make the Spouse Policy's third premium payment by the end of the thirty-one-day grace period.  On December 3, 2001, he received a letter from MONY.  (Doc. 44-6 at 26.)  The letter informed him:

While the grace period . . . expired, . . . we would be happy to restore this policy (subject to its provisions on lapse and reinstatement) if, within the next twenty days, we receive your payment . . . . We encourage you to remember the importance of the protection you secured when you purchased the policy, and remit your payment promptly. . . . [R]einstatement of your policy in the future requires the inconvenience of completing additional forms and may be subject to additional underwriting.

(*Id.*)  Dr. Siderides paid the premium within the twenty-day restoration period.[1]  (Doc. 44-5 at 3.) MONY did not require him to pay any interest on the premium or to provide any evidence of insurability.  He received no documentation related to lapse or reinstatement of the policy.  The policy continued and his premium due dates remained as scheduled.  (Doc. 47 at 4, 8.)

Dr. Siderides subsequently failed to pay his premium by the end of the grace period on thirty-four occasions between 2001 and 2010.  Each occasion proceeded as the first described above: Dr. Siderides would receive a "restoration letter," he would pay the overdue premium within twenty days, and his policies would continue in force.  (*Id.* at 8.)

---

[1]  Dr. Siderides generally paid his premiums through his agent, David Halper.  (Doc. 47-4 at 162) (Plaintiffs' Exhibit Q, Phone Records).

The second quarterly premiums for the Trust and Spouse Policies were due on May 2, 2010. Because Dr. Siderides's pulmonary fibrosis impaired his cognitive and memory functions, his son, Elliot Siderides, was granted power of attorney over Dr. Siderides's affairs on May 11, 2010. (*Id.* at 5.) During the next month, Elliot Siderides paid many of his father's bills, including the second quarterly premium on the Estate Policy. He did not pay the premiums on the other two policies, and was unaware until *after* his father's death that they remained unpaid. (*Id.*) The thirty-one-day grace period for the premium payments on the Trust and Spouse Policies expired on June 2, 2010. (*Id.*) On June 2, MONY issued restoration letters for these policies. (*Id.*) Elliot Siderides discovered that the two premiums remained unpaid shortly after his father's death on June 7, 2010, and he wired the payments to MONY on June 14. (Doc. 47-4 at 101.)

MONY returned the wired payments on July 6, 2010. (Doc. 43 at 6.) It denied plaintiffs' claim for death proceeds under the Trust and Spouse Policies. MONY sent a letter to plaintiffs on July 26, 2010 explaining its decision. (Doc. 47-4 at 104.) The letter states:

> [S]ince the policy was not in force when the insured became deceased, no claim can be considered under it. . . .
>
> If any premium is not paid by the end of the grace period the policy will end at once.
>
> In those instances, when the premium payment was not received within the grace period, a letter was sent indicating the grace period had expired. It also included an offer to restore the policy, subject to its provisions on lapse and reinstatement, if premium payment was received within the following 20 days. . . .
>
> On June 2, 2010, the policy lapsed and the letter referred to above was mailed. Unfortunately, Mr. Siderides became deceased before the required premium was paid and before the policy could be restored.

*Id.*

Plaintiffs filed this action in the Superior Court of Connecticut on March 4, 2011, requesting the death proceeds under the Trust and Spouse Policies plus interest. (Doc. 1 at 17.) The action was removed to federal court on diversity grounds.

## II.    Legal Standards

### A.    Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 173-74 (2d Cir. 2012). The burden is on the moving party to show that it is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The non-moving party receives the benefit of favorable inferences drawn from the underlying facts. *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor." *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002).

### B.    Construction of Insurance Policies

A life insurance policy is construed "by the local law of the state where the insured was domiciled at the time the policy was applied for . . . ." *Bush v. MONY Life Ins. Co. of Am.*, No. 3:07-cv-451(WWE), 2008 WL 4874137, at *4 (D. Conn. Nov. 10, 2008) (internal quotation omitted). Since Dr. Siderides as well as his trustee, Medina Vasily, resided in Connecticut at the time he applied for the policies at issue, the court applies Connecticut law.

## III.    Analysis

MONY has moved for summary judgment with respect to each count. The court considers the counts in order.

### A.    Breach of Contract

MONY argues that it is entitled to summary judgment on plaintiffs' breach-of-contract claim because it did not breach the contracts—it denied plaintiffs' claim for death proceeds in accordance with the policies' terms. (Docs. 43 at 7-9; 50 at 2-3.) MONY argues as follows: the

Trust and Estate Policies had lapsed by the time of Dr. Siderides's death because the grace period had expired; reinstatement requires payment of the overdue premium with interest plus evidence of continued insurability; evidence of insurability during the twenty-day restoration period allowed by MONY's letter includes the condition that the insured be alive; and, because at the time MONY received the overdue premiums on the Trust and Spouse Policies the insured had died, plaintiffs could not provide satisfactory evidence of insurability and therefore could not reinstate the lapsed policies.

MONY relies upon the provisions of the policy to support its argument. The provision entitled "Grace Period" states that if a premium is not paid at the end of the grace period, the policy will end at once. (Doc. 44-1 at 9.) The provision entitled "Reinstatement" states that in order to reinstate a policy—which can be done within five years of the due date of the overdue premium—MONY requires "evidence satisfactory to us of the insured's insurability" plus payment of all overdue premiums and eight percent interest. (*Id.* at 11.) Additionally, internal MONY reinstatement guidelines provide that during the thirty days following the expiration of the grace period, no evidence of insurability is required, "[p]rovided the Insured is living when the payment is received." (Doc. 44-3 at 3 ("Reinstatement Tables"); doc. 47-4 at 82-83 (D'Arrigo Dep. 43-44).)

In response, plaintiffs make two arguments—one relying on principles of contract modification and the other on equitable estoppel. Both arguments concern the effect of the restoration letters that MONY routinely mailed to Dr. Siderides when he had not paid a premium by the end of the grace period.

### i.    Modification

Plaintiffs argue that the restoration letters *modified* the life insurance policies because they "consistently allowed Dr. Siderides to cure any lapse caused by non-payment of the premiums within the Policies' grace periods, so long as payment of such overdue premiums was made within 20 days from the date of the Restoration Letters." (Doc. 47 at 7.) Plaintiffs contend that this "repeated extension of time afforded to Dr. Siderides, without any penalty, created an understanding between the parties that non-payment of premiums within the grace period could be cured if paid within twenty days from the date of the Restoration Letters." (*Id.* at 13.)

MONY replies that the restoration letters incorporated the policies by reference and did not modify the policies.

A modified contract is essentially a new contract which must pass the same tests and scrutiny that apply to the initial determination of whether an enforceable agreement exists. A valid contract modification requires "mutual assent to the meaning and conditions of the modification and the parties must assent to the same thing in the same sense." *Herbert S. Newman & Partners, P.C. v. CFC Constr. Ltd. P'ship*, 674 A.2d 1313, 1320 (Conn. 1996) (internal quotation omitted). Modification also "must be supported by valid consideration and requires a party to do, or promise to do, something further than, or different from, that which he is already bound to do." *TD Bank, N.A. v. M.J. Holdings, LLC*, 71 A.3d 541, 548 (Conn. App. Ct. 2013). Whether the parties intended to modify a contract is a question of fact. *Id.* "[T]he plaintiff bears the burden of proving that the parties clearly intended to modify the existing contract." *In re Ne. Res., Inc.*, 21 B.R. 109, 111 (Bankr. D. Conn. 1982).

In reviewing the record evidence submitted by the parties, there is no basis on which a factfinder could reasonably determine that MONY intended to create a new, modified contract. While modification of a contract "may be inferred from the attendant circumstances and conduct of the parties," *Herbert S. Newman & Partners, P.C.*, 674 A.2d at 1320, MONY's conduct does not support an inference that it intended to modify its insurance policies with Dr. Siderides to remove the policies' requirement that the insured show evidence of insurability to reinstate the policy.

In considering whether there is evidence that MONY intended to modify the terms of its policy to extend the initial thirty-day grace period by the additional twenty days permitted by the restoration letters, the court considers whether the language of the restoration letters or other conduct by MONY, including the creation of the internal manual, demonstrate any intent to change the terms of the policies. Both the restoration letters and the manual are consistent with the original policy provisions. Neither provides evidence from which a factfinder could infer an intent to change the provisions of the policies.

The policies themselves contemplate a reinstatement period of up to five years following the lapse of the policy upon proof of continued insurability and payment of interest on the late

premiums. The restoration letters sent to Dr. Siderides were more lenient than the policy provisions because they allowed for the reinstatement of coverage for a twenty-day period without additional evidence of insurability such as a medical form. They also did not require payment of interest. A party to a contract may relax a requirement which is in its favor without modifying the contract for all time. *See RBC Nice Bearings, Inc. v. SKF USA, Inc.*, 78 A.3d 195, 205 (Conn. App. Ct. 2013) (affirming conclusion that exchange of emails showing that defendant "declared a purchase commitment that was below the minimum purchase requirement" during fifth year of contract did not modify defendant's annual minimum purchase requirement).

MONY's internal reinstatement guidelines shed light on the issue of whether the company intended to modify the policies. These guidelines allow reinstatement within sixty-one days of the premium due date without payment of interest or proof of insurability "[p]rovided the Insured is living when the payment is received." (Doc. 44-3 at 3 ("Reinstatement Tables").) The guidelines demonstrate that MONY understood that all policies covered by its manual allowed for reinstatement on the terms routinely offered to Dr. Siderides. There is no evidence that MONY believed that it was necessary to modify the policies issued to Dr. Siderides (or any other policies) in order to provide a simplified means for an insured to reinstate coverage after a lapse.

There are cases in which conduct which varies from contract requirements can demonstrate an intent to modify the contract terms. *See, e.g., Alarmax Distribs., Inc. v. New Canaan Alarm Co.*, 61 A.3d 1142, 1149 (Conn. App. Ct. 2013) (concluding that parties' practice of operating credit line as running account—where contract called for a thirty-day payment term—constituted modification); *Precision Mech. Servs., Inc. v. Shelton Yacht & Cabana Club, Inc.*, 903 A.2d 692, 696 (Conn. App. Ct. 2006) (affirming finding of modification where defendant—despite having rejected plaintiff's change order increasing contract price to install sprinkler system—directed employees to perform work in accordance with the change order). These cases differ from this one because the change in performance of contract obligations is far greater in scope than allowing an insured an extra twenty days to make a payment. These decisions recognize that a change in contract terms may be enough to give rise to a novation—a new contract which both parties have accepted through conduct manifesting assent. But not every departure from the letter of the contract creates a new contract. In this case, the departure was relatively minor. There is no direct evidence from a MONY representative that the company

intended to alter the terms of the policy. And there is no evidence from which a fact-finder could infer such an intent.

These communications may have led Dr. Siderides to believe in a change in the policy requirements, but such a one-sided understanding is analyzed as an estoppel, not a mutual agreement to modify. For this reason, the court postpones any consideration of the evidence of his understanding and expectation until the next portion of the decision.

Plaintiffs have not shown that the insurance contracts were modified in spite of the merger clause in each policy, which provides that the "[p]olicy is a contract," and that the "[p]olicy, any attached riders and/or endorsements, the application and any supplemental applications make up the entire contract." (Doc. 44-1 at 11.) "[A] merger clause inserted into an agreement establishes conclusive proof of the parties' intent to create a completely integrated contract, and the court is forbidden from considering extrinsic evidence on the matter unless there was unequal bargaining power between the parties." *Glidepath, LLC v. Lawrence Brunoli, Inc.*, No. HHDCV106014624S, 2012 WL 6924526, at *4 (Conn. Super. Ct. Dec. 21, 2012) (citing *Tallmadge Bros., Inc. v. Iroquois Gas Transmission Sys., LP*, 746 A.2d 1277, 1291 (Conn. 2000)). Plaintiffs do not claim there was unequal bargaining power between the parties to the insurance contracts, from which fact alone the court could conclude that the insurance contracts were fully integrated. *See Barber v. Skip Barber Racing Sch., LLC*, No. CV030090036S, 2005 WL 3509774, at *15 (Conn. Super. Ct. Nov. 22, 2005) ("There is no claim that there was unequal bargaining power between the parties. Therefore, both agreements with Chrysler and the APA are fully integrated, and the court cannot consider evidence to vary or contradict the terms of these agreements."). Even if the court were to consider the admittedly real possibility that an insured and an insurance company do not bargain on equal footing, *see, e.g., Grand Sheet Metal Prods. Co. v. Prot. Mut. Ins. Co.*, 375 A.2d 428, 430 (Conn. Super. Ct. 1977) (recognizing unequal bargaining power of the parties to an insurance contract), it would nonetheless conclude that the policies were not modified for the reasons already stated above. The record evidence before the court fails to support the plaintiffs' position that the restoration letters modified the insurance contracts.

### ii.    Equitable Estoppel

Plaintiffs argue that MONY should be *estopped* from asserting the evidence of insurability requirement because it never enforced it on over thirty previous occasions when it had the opportunity to do so.  (Doc. 47 at 13-14.)  According to plaintiffs, MONY failed to enforce the evidence of insurability requirement when it was in its benefit to do so—forgoing enforcement allowed it to collect a total of over $91,000 in premium payments from Dr. Siderides—and only seeks to enforce the provision now so that it can deny the claims for death proceeds.  Plaintiffs argue that MONY "should be estopped from now claiming that the very same reinstatement provisions, which it ignored when it was to its advantage, preclude payment of the Policies' death benefits."  (*Id.* at 14.)

### a.    Equitable Estoppel Standard

"The doctrine of estoppel is designed to prevent injustice by not permitting a party to repudiate a course of action on which another party has relied to his or her detriment."  28 Am. Jur. 2d *Estoppel & Waiver* § 1 (2015).  Under Connecticut law, the party asserting equitable estoppel must show two elements: first, that a party did or said something "calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and [that] the other party . . . change[d] its position in reliance on those facts, thereby incurring some injury."  *Winchester Indus., Inc. v. Sentry Ins.*, 536 F. Supp. 2d 203, 210 (D. Conn. 2008).  The party asserting equitable estoppel bears the burden of establishing its elements.  *Middlesex Mut. Assurance Co. v. Walsh*, 590 A.2d 957, 967 (Conn. 1991).  Whether the burden has been satisfied is an issue of fact.  *Id.*  "Equitable estoppel is not available to a party who conducts himself with a careless indifference to means of information reasonably at hand, or ignores highly suspicious circumstances which should warn him of danger or loss."  *Bealle v. Nyden's, Inc.*, 245 F. Supp. 86, 94 (D. Conn. 1965) (internal quotation omitted).

> An equitable estoppel does not so much shut out the truth as let in the truth, and the whole truth. Its office is not to support some strict rule of law, but to show what equity and good conscience require, under the particular circumstances of the case, irrespective of what might otherwise be the legal rights of the parties.

*Union Carbide Corp. v. City of Danbury*, 778 A.2d 204, 208 (Conn. 2001).

Connecticut courts have recognized that misleading conduct can suffice to meet the first

element of equitable estoppel. *See Lunn v. Tokeneke Ass'n, Inc.*, 630 A.2d 1335, 1338 (Conn. 1993) ("[F]or estoppel to exist, there must be *misleading conduct* resulting in prejudice to the other party.") (emphasis added); *Boyce v. Allstate Ins. Co.*, 673 A.2d 77, 82 (Conn. 1996) (denying equitable estoppel because plaintiffs failed to present evidence of misleading conduct by the defendant on which they could have reasonably relied, and noting that "equitable estoppel requires misleading conduct by one party resulting in prejudice to other") (citing *Lunn*, 630 A.2d at 1338); *John F. Epina Realty, Inc. v. Space Realty, Inc.*, 480 A.2d 499, 507 (Conn. 1984) (considering that plaintiffs could meet first prong of equitable estoppel through defendants' misrepresentation, but denying equitable estoppel on failure to meet the second element); *see also* Eugene R. Anderson & Nadia V. Holober, *Preventing Inconsistencies in Litigation with a Spotlight on Insurance Coverage Litigation: The Doctrines of Judicial Estoppel, Equitable Estoppel, Quasi-Estoppel, Collateral Estoppel, "Mend the Hold," "Fraud on the Court" and Judicial Evidentiary Admissions*, 4 Conn. Ins. L.J. 589, 642 (1998) ("[E]stoppel should apply [if] the person to be estopped willfully or through culpable negligence caused another to believe a certain set of events . . . . Bad faith, fraud and intent to deceive are not required for the doctrine of equitable estoppel to apply."). Because estoppel is based on conduct and its effect on the other party, it is unnecessary to prove any intent to mislead or induce reliance. *See* 28 Am. Jur. 2d *Estoppel & Waiver* § 1 (2015) ("Estoppel arises apart from any intention on the part of the one estopped.").

### b.   Whether MONY's Conduct Was Misleading

The record reveals that MONY established a course of dealing which could reasonably have misled Dr. Siderides to believe, as plaintiffs claim, that if the premiums were paid before the end of the twenty-day restoration period then the policies would remain in force. By the express terms of the policies, if a premium is not received by the expiration of the grace period then the policies "end at once" and "have no further value." (Doc. 44-1 at 9.) However, when Dr. Siderides missed the grace period deadline, MONY did not inform him that his policy had ended and had no further value. Instead, it mailed him a letter offering to restore the policy if he paid his premium within the following twenty days. MONY responds that these letters offered policy restoration "subject to the provisions on lapse and reinstatement." (Doc. 42 at 4.) The "Reinstatement" provision requires the (formerly) insured to provide MONY with eight percent

interest on the overdue premiums as well as evidence of the insured's insurability. (Doc. 44-1 at 11.) There is no provision titled "Lapse." Plaintiffs argue that, on the thirty-four occasions when Dr. Siderides restored his policies in this manner, MONY never requested either of these prerequisites to reinstatement—thus giving rise to Dr. Siderides's belief that MONY would not enforce the evidence of insurability requirement on future occasions.

Plaintiffs rely upon *Speziale v. National Life Insurance Co.*, 159 F. App'x 253 (2d Cir. 2005), as a closely analogous case. In *Speziale*, the plaintiff insured consistently paid his monthly premiums one month late due to a misunderstanding. The insurance company initially mailed him letters informing him that his most recent payment would be applied to the previous month. 159 F. App'x at 256. It continued to credit his monthly payments to the next premium due, i.e. the previous month's premium, for eighteen months without sending any more letters "or other notification that any premium remained unpaid or that the policy was otherwise not deemed by the company to be current." *Id.* The court concluded that the defendant life insurance company's course of dealing "was sufficient to establish a custom to receive [the plaintiff's] overdue premium payments without objection, giving rise to an honest, reasonably founded belief on the part of the insured that payment of premiums was correct." *Id.* The court held that the insurance company was "estopped from treating the policy as lapsed." *Id.*

MONY seeks to distinguish *Speziale* because, unlike the defendant insurance company in that case, it "consistently sent the Insured or the Trustee letters notifying them when the Policies had lapsed for nonpayment of premium." (Doc. 50 at 7-8.) However, as plaintiffs observe, MONY mischaracterizes the content and effect of the restoration letters. The restoration letters did not inform Dr. Siderides that his policies were terminated; rather, they informed him that the grace period had expired and that he could "restore" the policies if MONY received his payment within the next twenty days.

The restoration letters informed Dr. Siderides that "if a loan was previously taken on [his] policy, the outstanding loan balance may be reportable as income to the IRS *in the event of a policy lapse*," (*see, e.g.*, Doc. 44-6 at 26 (emphasis added)), from which Dr. Siderides could infer that MONY may not have considered his policies as "lapsed" at the time he received the restoration letters. The restoration letters also distinguished between restoring the policies under the restoration procedure versus *reinstating* the policies "in the future," which "requires the

inconvenience of completing additional forms and may be subject to additional underwriting."
(*Id.*) While the restoration letters offered to restore the policies "subject to [the] provisions on lapse and reinstatement," as noted above, the "Reinstatement" provision's requirements of interest and evidence of insurability were never enforced and the provision on lapse does not exist. The reasoning of the *Speziale* decision applies to this case: the course of dealing established by MONY's restoration procedure could have led Dr. Siderides to form a reasonable belief that payment within the twenty day restoration period would be treated by MONY in the same way as payment within the previous thirty-one-day grace period.

That MONY's restoration procedure was inconsistent with the express terms of the policies further supports plaintiffs' argument for equitable estoppel:

> [A]cceptance of inconsistent performance, such as a partial or insufficient payment of premium under a life insurance policy, when the circumstances show equivocal or misleading conduct on the part of an insurance company in its acceptance, may be the basis of a waiver or estoppel against the company's right to demand performance according to specifications in the policy.

*Pierson v. John Hancock Mut. Life Ins. Co.*, 262 Cal. App. 2d 86, 89 (Cal. Ct. App. 1968); A.E. Korpela, *Insurer's Acceptance of Defaulted Premium Payment or Defaulted Payment on Premium Note, as Affecting Liability for Loss Which Occurred During Period of Default*, 7 A.L.R. 3d 414 at § 2(a) (originally published in 1966) ("[M]any courts distinguish between conduct which is consistent with the policy and conduct which is not . . . . [T]he insurer may not treat the policy as lapsed for purposes of liability and as in force for purposes of collecting premiums, and . . . in choosing to accept the delinquent premiums the insurer impliedly chooses to treat the policy as in effect from the time of default, in the absence of policy provisions making some other explanation determinative of the question.").

A belief on the part of Dr. Siderides that evidence of insurability would not be required during the restoration period is also plausible because MONY appeared to waive the reinstatement requirements of proof of insurability and interest without reservation or explanation. MONY never explained to Dr. Siderides that it accepted his overdue payments during the twenty-day restoration period under the assumption that he was still alive at the time the payments were received—or that this assumption fulfilled the evidence of insurability

requirement.[2]  MONY did not explain to him that it waived the eight percent interest requirement on those occasions for reasons of administrative convenience.  (Doc. 47-4 at 92 (D'Arrigo Dep. 151:12-16).)  In fact, MONY's conduct established no functional difference between receiving an overdue premium during the grace period versus during the subsequent twenty-day restoration period.  Records of phone calls between Dr. Siderides and MONY employees provide some evidence that he grew to rely on the restoration letters to prompt his payments of overdue premiums to ensure he was not "delinquent."  (Doc. 47-4 at 162 (Plaintiffs Exhibit Q, Phone Record entitled "Case Brenda 2-6-09 2") ("I didn't get a letter . . . . All the time you send me a letter when I'm late. . . . Every time I was borderline late or so they [his insurance agent David Halper] would call because they got a copy . . . they [MONY] were supposed to send me too.").)

If, on the other hand, MONY had accepted Dr. Siderides's premiums during the restoration period conditionally—for instance by offering to restore his policies provided he remained alive when payment was received—plaintiffs' case for equitable estoppel would be weaker.  *See, e.g., Spinelli v. Monumental Life Ins. Co.*, 476 F. Supp. 2d 898, 910 (N.D. Ill. 2007) (denying plaintiff's waiver[3] argument because "every monthly premium payment that Plaintiff missed [could] be accounted for" and noting that defendant insurance company "thoroughly documented compliance with its policies"); *Indep. Life & Accident Ins. Co. v. Pantone*, 56 S.E.2d 153, 156 (Ga. Ct. App. 1949) (holding life insurance policy had lapsed for nonpayment of premiums, and therefore beneficiary was not entitled to death proceeds after insured died, where policy required evidence of insurability for reinstatement and provided that "reinstatement shall not become effective . . . except that at the time of such payment the insured is alive and in sound health"); Korpela, *supra*, at §2(a) ("[C]ourts often have refused to find a waiver when acceptance of the past-due premiums was conditional, as when the premium has

---

[2]  Internal MONY reinstatement guidelines provide that during the thirty days following the expiration of the grace period, the evidence of insurability required consists of nothing, "[p]rovided the Insured is living when the payment is received."  (Doc. 44-3 at 3 ("Reinstatement Tables").)  However, MONY presents no evidence showing that Dr. Siderides knew of these guidelines.

[3]  While waiver and equitable estoppel are analytically distinct doctrines, the Connecticut Supreme Court has noted that "implied waivers and estoppels by conduct are so similar that they are nearly indistinguishable."  *Hanover Ins. Co. v. Fireman's Fund Ins. Co.*, 586 A.2d 567, 573 (Conn. 1991) (internal quotation omitted).

been accepted pending determination of the health status of the insured for future coverage . . . .").

MONY also contends that any belief on the part of the insured that it would not require him to be alive in order to restore a policy is unfounded because a clause in the policies states that "[n]o premium due is payable on or after the date of the Insured's death." (Doc. 44-1 at 8.) Yet MONY's restoration letters—which expressly indicated that the offer to restore the policies was subject to the policy provisions on "lapse and reinstatement"—did not specify that MONY offered to restore the policies subject to their "Premiums and Policy Exchange" provision, in which the clause MONY cites is located. Dr. Siderides could therefore have drawn a negative inference that the twenty-day restoration procedure was not necessarily subject to any particular clause within the "Premiums and Policy Exchange" provision. Such an inference is also supported by the fact that death proceeds are still paid if the insured dies during the grace period and has not yet paid the overdue premium. Furthermore, if Dr. Siderides had considered the possibility that the restoration offer was subject to the "Premiums" provision clause foreclosing premium payment after the insured's death, he may have discounted it after observing that MONY never enforced this clause during the restoration period either. While considering a motion for summary judgment, the court must grant the non-moving party all favorable inferences. *Hayes*, 84 F.3d at 619.

Whether MONY's actions caused Dr. Siderides to believe that MONY would not require evidence of insurability to restore his policies during the twenty-day restoration period is therefore a genuine issue of material fact.

### c.   Whether Dr. Siderides Relied on MONY's Misleading Conduct

Plaintiffs also present evidence indicating that Dr. Siderides did not intend to allow his policies to lapse in June 2010. (*See, e.g.*, Doc. 47-4 at 101 (Affidavit of Elliot J. Siderides); Doc. 47-4 at 162 (Plaintiffs Exhibit Q, Phone Records).) Consequently, a factfinder could infer that Dr. Siderides's practice of continually paying his overdue premiums during the twenty-day restoration period caused him to incur injury, namely MONY's denial of plaintiffs' claim for death proceeds under policies that Dr. Siderides intended to remain in force. *See also Liberty Bank v. New London Ltd. P'ship*, No. 4005236, 2007 WL 1416944, at *5 (Conn. Super. Ct. May 1, 2007) (denying summary judgment due to issue of fact regarding equitable estoppel where

"defendants stated that if [they] had known that the plaintiff would not continue being lenient, then the payment [toward a loan] would have been made within the first ten days of the month"). In other words, there is evidence to support a potential finding that if Dr. Siderides had known he risked forfeiting his policies by paying his premiums during the restoration period, he would likely have made a much stronger effort to pay them—including the premiums that were still overdue on the date of his death—during the immediately preceding grace period.

### d.   Plaintiffs' Defensive Use of the Equitable Estoppel Doctrine

Plaintiffs have asserted equitable estoppel as a separate cause of action.  (Doc. 1 at 13.) MONY is correct that equitable estoppel is not an appropriate cause of action under Connecticut law.  *See Dickau v. Town of Glastonbury*, 242 A.2d 777, 780 (Conn. 1968) ("[E]quitable estoppel is available only for protection and cannot be used as a weapon of assault.") (quotation omitted); *Nationwide Mut. Ins. Co. v. Pasiak*, No. X08FSTCV084015401, 2011 WL 6413817, at *6 (Conn. Super. Ct. Nov. 30, 2011) (noting that "several Superior courts have stricken counts of equitable estoppel for improperly attempting to set forth a cause of action" and citing cases).

Whether a party may assert estoppel, however, does not depend upon whether the party is a plaintiff or a defendant.  A plaintiff may raise estoppel as a defensive response to a defendant's assertion that it has complied with the terms of a contract.  *See* 28 Am. Jur. Estoppel & Waiver § 27 (2015) ("[E]stoppel is a means of preventing a party from asserting a legal claim or defense that is contrary or inconsistent with his or her prior action or conduct.").

MONY agreed at the March 27, 2015 hearing on this motion that plaintiffs may assert equitable estoppel as a defense to their motion for summary judgment on the breach-of-contract claim.  The court therefore considers plaintiffs' equitable estoppel argument in the context of their breach-of-contract claim, and not as a separate cause of action.  *See Covey v. Comen*, 698 A.2d 343, 345 n.5 (Conn. App. Ct. 1997) (treating a counterclaim of estoppel as a special defense).

### e.   Conclusion

A finder of fact could conclude that MONY's twenty-day restoration procedure misled Dr. Siderides into believing that the specific requirements in the policies' reinstatement

provision—most importantly the evidence of insurability—would not be enforced during the twenty-day restoration period; and that Dr. Siderides had not yet paid, through his agent or his power of attorney, two of the policy premiums at the time of his death in reliance upon this belief. Therefore, a genuine issue of material fact precludes summary judgment on plaintiffs' breach-of-contract claim.

### iii.   Known Loss Doctrine

MONY also argues that it is entitled to summary judgment on plaintiffs' breach-of-contract claim pursuant to the known loss doctrine. (Doc. 43 at 9.) The known loss doctrine holds that "an insured may not obtain insurance to cover a loss that is known before the policy takes effect." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Stroh Cos., Inc.*, 265 F.3d 97, 106 (2d Cir. 2001) (internal quotation omitted). "In its most simplistic formulation, the known loss doctrine states that one may not insure against the loss of a building after the building has burned down." *Travelers Cas. & Sur. Co. of Am. v. Netherlands Ins. Co.*, 95 A.3d 1031, 1054 (Conn. 2014) (internal quotation omitted). In Connecticut, the known loss doctrine is narrowly construed; "insurance coverage would be precluded 'for damage deliberately done before the inception of insurance, or for damage that has been fraudulently concealed from the insurer prior to the purchase of the insurance policy.'" *Nationwide Prop. & Cas. Ins. Co. v. Greater New York Mut. Ins. Co.*, No. CV065002440, 2009 WL 3087247, at *6 (Conn. Super. Ct. Aug. 10, 2009) (quoting *Peck v. Pub. Serv. Mut. Ins. Co.*, 363 F. Supp. 2d 137, 145 (D. Conn. 2005)).

The known loss doctrine is inapplicable to this case. Dr. Siderides initiated life insurance coverage nine years before his death, and had a continuous and ongoing relationship with MONY, his insurer. As discussed in detail above, plaintiffs have identified an issue of fact about whether the Trust and Estate Policies should be considered in force at the time of the insured's death. This is not a case in which plaintiffs lied or concealed information from an insurance company in order to initiate or reinstate coverage that had lapsed. *Cf. Travelers Prop. Cas. v. H.A.R.T., Inc.*, No. CV980485730S, 2001 WL 649616 (Conn. Super. Ct. May 18, 2001) (applying known loss doctrine to preclude coverage where former insured tried to reinstate auto insurance coverage after accident occurred and without informing insurer of accident, and after policies had lapsed and notices of cancellation had been received). MONY's motion for summary judgment on plaintiffs' breach-of-contract claim is denied.

### B.    Disproportionate Forfeiture

Plaintiffs also assert as a cause of action "disproportionate forfeiture/unfair penalty." (Doc. 1 at 15.)  A "long-established" rule holds "that forfeiture of life insurance coverage for late premiums is not favored in the law; and that courts are always prompt to seize hold of any circumstances that indicate an election to waive a forfeiture . . . ." *Speziale*, 159 F. App'x at 255 (internal quotation omitted).  Therefore:

> [A] course of action on the part of the insurance company which leads the insured honestly to believe that by conforming thereto a forfeiture of his policy will not be incurred, followed by due conformity on his part, will and ought to estop the company from insisting upon the forfeiture, though it might be claimed under the express letter of the contract.

*Id.* (internal quotation omitted).

The principle regarding forfeiture generally informs courts' consideration of breach-of-contract claims (often within the context of waiver or equitable estoppel defenses) rather than serving as a separate cause of action, as even the cases plaintiffs cite in the section of their argument devoted to disproportionate forfeiture reveal.  *See, e.g., Speziale*, 159 F. App'x at 255 (noting that "forfeiture of life insurance coverage for late payment of premiums is not favored in the law" while affirming judgment against insurance company on equitable estoppel grounds) (internal quotation omitted); *McKeeman v. Gen. Am. Life Ins. Co.*, 899 P.2d 1124, 1129 (Nev. 1995) (noting that "[f]orfeiture of a policy will be avoided on any reasonable showing" while considering waiver and equitable estoppel arguments) (internal quotation omitted); *Union Life Ins. Co. v. Brewer*, 309 S.W.2d 740 (Ark. 1958) (citing the "general rule" that forfeitures are disfavored while considering waiver and equitable estoppel arguments).

The court has already concluded that an issue of fact regarding equitable estoppel precludes summary judgment on the breach-of-contract claim.  It is thus the unresolved issue of equitable estoppel that precludes summary judgment for MONY, and not any independent claim of "disproportionate forfeiture."  The equitable doctrine of estoppel contains within itself a policy concern against forfeiture.  MONY's motion for summary judgment on plaintiffs' cause of action entitled "disproportionate forfeiture/unfair penalty" is granted.

C.     **Implied Covenant of Good Faith and Fair Dealing**

The final count in plaintiffs' complaint alleges that MONY breached its duty of good faith and fair dealing.  (Doc. 1 at 16.)  This count recasts plaintiffs' equitable estoppel argument as a breach of the duty of good faith and fair dealing.  (*See id.* at 16-17 ("MONY's refusal to pay to plaintiffs the Policies' proceeds upon proper notification of Lambros Siderides's death, . . . despite its continued and repeated acceptance of premiums after the lapse of the Trust Policy and Spouse Policy Grace Periods, constitutes a breach of the implied covenant of good faith and fair dealing . . . .").)

It is true that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Warner v. Konover*, 553 A.2d 1138, 1140 (Conn. 1989) (internal quotation omitted).  However, "[a] breach of the implied covenant of good faith and fair dealing involves a defendant acting in bad faith to impede the plaintiff's right to receive his or her reasonably expected benefits under the contract." *Belz v. Peerless Ins. Co.*, 46 F. Supp. 3d 157, 164-65 (D. Conn. 2014).  Moreover,

> [b]ad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.

*De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 849 A.2d 382, 388 (Conn. 2004) (internal quotation omitted).

Plaintiffs argue that MONY acted in bad faith when it "undertook a process of claim denial that was free of any meaningful thought or dialogue about the particular facts and extenuating circumstances of the plaintiffs' claim." (Doc. 47 at 24.)  Plaintiffs cite in support of this argument the facts that: the director of claims reviewed the claim "just once" before deciding to deny it, and did not discuss it with certain other MONY employees, (*id.* at 24-25; doc. 47-4 at 134-36 (Plaintiffs' Exhibit N; Burdick Dep. 49-51)); certain MONY employees were not apprised of details of plaintiffs' claim, (doc. 47 at 25); and MONY did not consider Dr. Siderides's mental state when it denied the claims for death proceeds.  (*Id.* at 26.)

There is no evidence here that MONY denied plaintiffs' claims for death proceeds in bad faith.  Plaintiffs have not shown that MONY's practice and policy or industry standards required

that they receive a more extensive review process. Similarly, they point to no evidence that MONY denied them a fair review with fraudulent or otherwise ill intent. At most, plaintiffs have alleged that MONY failed to conduct an individualized inquiry into the reasons for the late payments. Such conduct could amount to negligence, but it does not amount to the type of ill will or dishonesty which would support a bad faith claim. Bad faith "means more than mere negligence; it involves a dishonest purpose." *De La Concha*, 849 A.2d at 388. Plaintiffs' claim that MONY breached the implied covenant of good faith and fair dealing is denied, and judgment is granted in favor of MONY on this claim.

## IV.    Conclusion

For the reasons stated above, MONY's motion for summary judgment is DENIED as to plaintiffs' breach-of-contract claim on equitable estoppel grounds. Summary judgment is GRANTED in favor of MONY on plaintiffs' remaining causes of action.

Dated this 8th day of May, 2015.

Geoffrey W. Crawford, Judge
United States District Court